BRAMBLET v. DAVIS.

(Circuit Court of Appeals, Sixth Circuit. December 20, 1905.)

No. 1,421.

1. BOUNDARIES—LOCATION FROM DESCRIPTION IN PATENT—EFFECT OF EXTENSION BEYOND STATE LINE.

The fact that the boundaries of a tract of land as given in a state patent, based on a survey made at the instance of the patentee, extend beyond the state line, affords no ground for the relocation of the tract by the courts, so as to place it all within the state. The true rule requires them to ascertain and locate that portion of the boundary which lies within the state by the usual methods, running the lines backwards and in reverse order from known corners according to the calls of the patent where necessary, and to exclude from the tract that portion which lies without the state by taking the state line as the boundary between the points where such line is crossed by the lines of the survey.

2. PUBLIC LANDS—PURCHASER OF STATE LANDS—DEFICIENCY IN QUANTITY.

A purchaser of state lands, who selects the land and has a "call" survey of the same made by protraction without actually running the lines, and applies for and obtains a patent in accordance with such survey, takes the risk of overlaps upon prior grants and of loss by reason of the extension of the boundaries, if run in accordance with the calls of the survey and patent across the line of the state; and a grantee of such purchaser takes no greater rights in those respects than his grantor had.

Appeal from the Circuit Court of the United States for the Eastern District of Kentucky.

Frank Chinn and Wm. Ayres, for appellant.
Helm Bruce and W. O. Harris, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit to quiet the title to land in Harlan county, Ky. The complainant, Charles Henry Davis, trustee, claims title under a patent issued September 25, 1845, on a survey dated March 3, 1845. The defendant, George W. Bramblet, claims under a junior patent issued January 28, 1846, on a survey dated March 6, 1845. The first patent, calling for 86,000 acres of land, was issued to Ledford, Skidmore, and Smith, and will be referred to as the Ledford patent. The second, calling for 9,500 acres, was issued to Moses Cawood. The controversy grows out of an alleged conflict in the boundaries of the two patents, and involves the true location of the Ledford patent; that of the Cawood patent being undisputed. Located in one way, the Ledford patent embraces the entire land called for by the Cawood patent. Located in another, the conflict is but slight. The description of the land granted by the Ledford patent is as follows:

"A certain tract or parcel of land, containing 86,000 acres, by survey, bearing date the third day of March, 1845, lying and being in the county of Harlan, and bounded as followeth, to wit: Beginning on Crank's creek, on two beeches and two sugar trees, beginning corner to said Smith's 1,500-acre survey; thence S. 70° W. 664 poles, to three beeches, beginning corner to Smith's 600-acre survey; thence S. 28° W. 400 poles, to a stake on the top of Cumberland Mountain; then S. 60° W. 8,320 poles, to a stake near Cumberland Gap; thence N. 15° E. 3,200 poles, to a stake; thence N. 55° E. 8,820 poles, to a stake; thence S. 5° W. 3,150 poles, to the beginning, with its appurtenances."

The order of the Harlan county court for the survey was made March 3, 1845, and on the same day the certificate of survey, on which the patent was issued, was made. This survey describes the property precisely as it is described in the patent. Accompanying it was a plat in the following form:

Laid out by the courses and distances given above, the boundary of the survey closes, defining a tract of land of about the shape shown above, running in its longest direction from northeast to southwest, the southeast side of which (made up of the first, second, and third lines) is approximately 30 miles long, the opposite or northwest side (bounded by the fifth line) 27½ miles long, and the ends (being the fourth and sixth lines about 10 miles long. It contains in round numbers 300 square miles, or 192,000 acres, over 100,000 acres more than called for.

Coming to the location of the patent, it will be observed that the first and second lines call for known natural objects as corners—the first corner being "on Crank's creek, on two beeches and two sugar trees, beginning corner to said Smith's 1,500-acre survey"; the second corner, "three beeches, beginning corner to Smith's 600-acre survey"; and the third corner, "a stake on the top of Cumberland Mountain." By their use, the first line, with a slightly changed course, was found to be 911.5 poles, instead of 664 poles, in length, and the second line 463.4 poles, instead of 400 poles, in length. The increase in length of these two lines, amounting to 310.7 poles, and the slight change in their bearing, would necessarily produce a slight variation at the point of closure, but so slight in so great a perimeter (almost 80 miles in length) that the survey, with the first and second lines thus located, may be said practically to close. The first and second lines, thus defined by natural objects, are the only ones about whose location there is no dispute. The second ends at "a stake on the top of Cumberland Mountain." The state line between Kentucky and Virginia, in this locality, runs along the top or highest point of Cumberland Mountain, so that

the third corner is on the boundary which marks the limit of the territorial jurisdiction of Kentucky.

Right here is where the difficulty in locating the patent begins, for the third line, which is defined as "then S. 60° W. 8,320 poles, to a stake near Cumberland Gap," if run from the third corner by this course and distance, crosses the state line, passes through the wedge-like point of Virginia between Kentucky and Tennessee, and ends in Tennessee about four miles southeast of Cumberland Gap. Taking the point thus fixed by course and distance as the fourth corner, and running the remaining lines (the fourth, fifth, and sixth) by the courses and distances given, the boundary practically closes. But because Kentucky had no authority to run its survey into other states, and no power to issue a patent for land located in other states, doubt was naturally thrown about the true location of the patent, and the matter has been before the courts, both state and federal, a number of times.

The first suit was brought by Maria Mott Davis, the grandmother of the complainant, and then the owner of the Ledford patent, against W. C. Farmer and others, to quiet her title to a tract of 12,900 acres claimed under a junior patent. This suit was instituted in the Circuit Court of the United States, and was decided by Judge Barr in 1894. 141 Fed. 703. He held that the fourth corner of the patent should be located at or in Cumberland Gap, and the third line should run with the state line from the third to the fourth corner thus ascertained. A few years later, a similar suit was brought by the same person in the same court to quiet her title under the Ledford patent against one Hinckley, claiming 67,000 acres under a junior patent. This suit was decided by Judge Evans, who followed Judge Barr in fixing the fourth corner at or in Cumberland Gap. 141 Fed. 708. Taking the fourth corner as being at or in Cumberland Gap, both Judge Barr and Judge Evans ran the fourth and fifth lines according to their courses and distances, and from the sixth corner, thus ascertained, ran a line to the beginning, thus closing the survey. As a result, the sixth or closing line, instead of running S. 5° W. 3,150 poles, ran S. 5° E. 4,560 poles, the course being changed 10 degrees, and the length increased 1,410 poles, or nearly 5 miles. This is the location contended for by the complainant below.

While the present case was pending in the court below, a suit involving the location of this patent was begun in the state court and decided by the Court of Appeals of Kentucky. This was the case of Creech v. Johnson, decided October 14, 1903, and reported in 116 Ky. 441, 76 S. W. 185. The highest court of Kentucky there held that, having located the first and second lines, about which there seemed to be no dispute, and thus reached the state line at the third corner, the way to deal with the difficulty presented was to go back to the beginning, reverse the courses and run the lines according to the calls of the patent, until the state line should again be reached. From this point, where the fourth line reversed should intersect the state line, run with the state line to the third corner, itself on the state line. The location thus fixed as compared with that made by Judges Barr and Evans, is roughly shown by a diagram printed in the opinion. 116 Ky. 447, 76 S. W. 186.

The court below had before it all of the opinions when it rendered its decision, but concurred in none of them. It declined to follow the decision of the Court of Appeals of Kentucky as one in a matter of local law, and in a most learned and elaborate opinion determined on a location of its own, different from any one of the others. Having run the first and second lines, as practically agreed upon, to the top of Cumberland Mountain, being the state line, it ran the third line, rejecting its course, with the state line, the distance called for in the patent, namely, 8,320 poles. Here it stopped and located the fourth corner, being a point 720.4 poles (about two and one-fifth miles) from Cumberland Gap. From the fourth corner thus fixed it ran the fourth line according to the course and distance given in the patent, thus fixing the fifth corner. It then went back to the beginning corner, reversed the course of the last line and ran it the distance of the call, thus fixing the sixth corner. It then closed the survey by running a line from the fifth corner thus fixed to the sixth corner thus fixed, without regard to either the course or distance of the patent; the result being that the fifth line, instead of running north 55° E. 8,320 poles, is made to run north 67.54° E. 8,156 poles. The locations made by the different courts are shown in the following map:

[Owing to the difficulty of imprinting one color upon another, as would be necessary if this cut was prepared as indicated by the court, the locations made by the different courts have been indicated as follows:

The lines according to the calls of the patent are indicated by 1, 2, 3, 4, 4c, 5, 6, 1. That portion which falls outside of Kentucky is represented by the lines south of the Cumberland Mountains, being 3 to 4 and 4 to 4c.

The lines as located by Judges Barr and Evans are indicated by numbers 1, 2, 3, 4c, 4b, 4a, 5a, 6a, 1.

The lines as located by the court below are indicated by 1, 2, 3, 4c, 4b, 5b, 6, 1.

The lines as located by the Court of Appeals of Kentucky are indicated by 1, 2, 3, 4c, 5, 6, 1. Editor.]

The line of Cumberland Mountain appears from the third corner to Cumberland Gap, which was selected by Judges Barr and Evans as the fourth corner. This line is colored red up to the point where the court below fixed the fourth corner, and from there on, blue. The fourth, fifth, and sixth lines, as located by Judges Barr and Evans, are colored blue; as located by the court below, red; and as located by the Court of Appeals of Kentucky, yellow. The third and the portion of the fourth line, according to the patent calls, which fall outside of Kentucky, are colored green. The acreages embraced in these locations are as follows: The location made by Judges Barr and Evans contains 182,184 acres, being 96,184 acres in excess of that called for by the patent; that made by the Court of Appeals of Kentucky contains within Kentucky 93,552 acres, an excess of 7,522 over that called for by the patent; and that made by the court below contains 149,352 acres, an excess of 63,352 over that called for by the patent.

From the decree enforcing this location an appeal has been taken to this court. Neither party is satisfied with the ruling of the court below; the appellant contending for the location made by the Court of Appeals of Kentucky, and the appellee for that made by Judges Barr and Evans in the Circuit Court of the United States. The doubt which hangs about the true location of this patent flows from the fact that no actual survey of the land purchased and to be patented was ever made. This is apparent, and may be taken as conceded. The patent was based upon a survey by protraction, known commonly as a "call" survey, which was made only on paper. The surveyor never went on the ground, and therefore left no "tracks" to follow. We are remitted to reason and the rules of construction to ascertain the meaning of the patent. Run by the courses and distances given, the survey closes, and it closes no matter which way the lines are run, whether forward or backward, whether directly or by the reverse method. The first, second, and third corners being fixed by natural objects, and the others described by courses and distances, there is no difficulty in locating the entire survey according to the strict terms of the patent. But it appears, when thus located, that part of it falls outside of Kentucky. Well, what of it? If the patentee saw fit to place part of his survey outside of Kentucky, ought the court therefore to be expected to relocate the patent and place all of it inside of Kentucky? We think not. If part of it clearly falls outside of Kentucky, that part fails, just as does part embraced in a prior patent.

The duty of the court in this contingency is not to strain the law and dislocate the survey, in order to bring all its lines within Kentucky, but simply ascertain and define the portion of the survey which does really lie within Kentucky. This can best be done by first locating the lines which lie in Kentucky, and locating them as nearly as possible according

to the calls of the patent. This is what common sense suggests and the settled rules of construction in such cases require. Let us quote the principles laid down in the leading case of Pearson v. Baker, 34 Ky. 321, 324, all of which apply to the present situation:

"First. In the general, distance yields to course, or, in the absence of any circumstance bringing the mind to a contrary conclusion, the courses shall be first pursued, contracting or extending the distances, as the case may require, to make the survey close. [Bryan v. Beckley] Litt. Sel. Cas. 91.

"Second. The beginning corner in the plat or certificate of survey is of no higher dignity or importance than any other corner of the survey. Beckley v. Bryan, Ky. Dec. 91; 1 Pirtle's Digest, 114.

"Third. The order in which the surveyor gives the lines and corners in his certificate of survey is of no importance to find the true position of the survey. Reversing the courses is as lawful and persuasive as following the order of the certificate. [Thornberry v. Churchill] 4 T. B. Mon. 32 [16 Am. Dec. 125].

"Fourth. That construction is to prevail which is most against the party claiming under an uncertain survey. It is his duty to show and establish his corners. Preston's Heirs v. Bowmar, 2 Bibb, 493. From which it will follow that he who sets up and relies on an outstanding claim must show that it embraces the land in contest, and should not succeed by using it, when it is uncertain whether it embraces it or not."

When, then, having located the first and second lines, we come to the beginning of the third, and find that, by running it according to the course and distance given in the patent, it crosses into Virginia and ultimately ends in Tennessee, a difficulty is presented which in our opinion entirely justifies us in going back to the beginning, reversing the calls, and tracing the lines the other way, so as first of all to locate the lines which do lie within Kentucky, and ascertain the boundaries of the granted land which is located there. There is no trouble in doing this, and, having run the sixth and fifth lines reversed, the fourth line reversed brings us again to the top of Cumberland Mountain, from which, if run out on the same course, the line would, at the distance given in the patent, strike the end of the third line run out according to the patent call. But since it is a vain thing to run the lines of a Kentucky survey outside of Kentucky, and since we have reached the boundary of the state at two widely separated points, one the beginning of the third line, and the other, practically, the beginning of the fourth, so that between the lines thus run and the boundary itself all the Kentucky land granted by the patent is really embraced, we may reject the third line and the part of the fourth outside of Kentucky, and adopt a new third line, which runs with the state line along the top of Cumberland Mountain between the two points mentioned. In this way all the lines are located as called for in the patent, except the third and part of the fourth, for which a portion of the state line is substituted ex necessitate, thus closing the survey and giving the patentee every acre of land in Kentucky which he is entitled to on that side. Bruce v. Taylor, 2 J. J. Marsh. 160.

The method adopted by Judges Barr and Evans, and by the court below, after ascertaining that the third line, run by course and distance, would leave Kentucky, cross the wedge-like point of Virginia, and land in Tennessee, was to make a new third line, with a new fourth corner, all located in Kentucky. To do this, Judge Barr and Evans rejected both the course and distance given in the patent, fixed the fourth corner at or in Cumberland Gap, and ran the line by the meanders of the top

of the mountain to it, while the court below, rejecting the course of the patent, ran the line by the meanders of the top of the mountain the distance of the call, and stopped, fixing his fourth corner there. We agree with the court below that Judges Barr and Evans were in error in fixing the fourth corner "at or in Cumberland Gap," merely because the patent says that the third line, after being run S. 60° W. 8,320 poles, would end "at a stake near Cumberland Gap." Under such a call, how "near" the stake, marking the terminus of the third line, would be to Cumberland Gap must be determined by running out the line according to its course and distance. Harry v. Graham, 18 N. C. 76, 78, 27 Am. Dec. 226. And the terminus of a line run a distance of 26 miles might well be said to be near a place so well known as Cumberland Gap if it should turn out to be about 4 miles from it. Rejecting Cumberland Gap as the fourth corner, and disregarding the course of the call, the court below ran the third line by the meanders of the top of Cumberland Mountain the full distance called for in the patent, and stopped there, although still 2 miles or more from Cumberland Gap. The fourth corner, thus fixed, was regarded near enough to come within the description of the patent.

In our opinion, the court below avoided one error to fall into another. It, too, created a corner not contemplated in the patent, but in a different way. Clearly the surveyor never intended to run the third line with the meanders of the state line either to Cumberland Gap or the distance of the call, or he would have said so. He intended to run the line S. 60°W. 8,320 poles, and thus fix the fourth corner, because the survey was a paper one, and only from the fourth corner thus fixed would the remaining lines of the call, when traced, close the survey. He probably supposed that a line run from the third corner S. 60° W. would stay in Kentucky; but he made a mistake, and the patentees took the chance. The fault we find with Judges Barr and Evans and the court below is that they made a new line and created a new corner before they were compelled to. Obviously, the running of the third and part of the fourth lines outside of Kentucky necessitated a new boundary on that side, which, of course, would be the state line; but it seems to us the proper way to find how much of the survey is bounded by the state line, is to go back to the beginning, reverse the courses, and run the calls until the state line is again reached. This, we think, is what would naturally be done if a possible purchaser under a junior patent wished to find out the boundaries of the Ledford patent on the northwest side.

The creation of a new fourth corner made more trouble. The fourth, fifth, and sixth lines, beginning at the new fourth corner and run according to the patent, would not close the survey by many miles. Various expedients for closing it were suggested and different ones adopted. Judges Barr and Evans ran the fourth and fifth lines according to the calls, and from the sixth corner thus fixed ran to the beginning. This changed the course of the sixth line from S. 5° W. to S. 5° E., and increased its length from 3,150 poles to 4,650 poles, a distance of almost 5 miles. If they had run the fifth line by its course until it intersected the sixth line, reversed and prolonged, the fifth line would have been 9,468 poles, instead of 8,820 poles, in length, an increase of 948 poles, or about 3 miles, and the sixth line 5,518 poles, instead of 3,150 poles in length,

an increase of 2,368 poles, or over 7 miles. To obviate the alteration in the course and distance of the sixth line, or the large increase in the distance of both the fifth and sixth lines, if run according to their courses, the court below, after running the fourth line the course and distance of the call, and thus fixing the fifth corner, went back to the beginning, reversed the call, ran the sixth line the course and distance of the patent, and fixed the sixth corner. The fifth and sixth corners thus fixed, it joined by a line of its own, having neither the course nor distance of the patent, the course being N. 67° 54' E., instead of N. 55° E., a change of 12° 54', and the distance being 8,156 poles, instead of 8,820 poles, a shortage of 664 poles, or about 2 miles.

We have already given the areas of the different locations. On the one side, it is contended that a location containing 96,184 acres in excess of that called for by the patent (as is the case with the location of Judges Barr and Evans) is by that fact alone put under suspicion; while, on the other hand, it is insisted that a grant of 93,552 acres (the area covered by the location of the Court of Appeals of Kentucky), although 7,552 acres in excess of the amount called for by the patent, will be reduced by existing prior grants, far below the 86,000 acres paid for, and to which the patentees were justly entitled. It appears in the record that the appellee's surveyor made a map showing the overlaps upon the location made by Judges Barr and Evans, and estimated they amounted to 105,000 acres, leaving about 87,000 acres. This estimate was not, however, supported by the production of the map, although it was said to be in existence, and the court refused afterwards to reopen the case for the purpose of going carefully into the overlaps, holding the inquiry not to be material at that stage of the case. We must therefore regard the testimony upon this point as unsatisfactory. Whatever might be shown, our conclusion would remain unaffected. If the patentees got more than 86,000 acres within the granted boundaries, it could not be said that they have been defrauded because of overlaps reducing the patentable amount below 86,000 acres. They took the risk of the overlaps when they laid down the survey where they did.

There was much discussion as to the effect which should be given the decision of the Court of Appeals of Kentucky in the case of Creech v. Johnson, 116 Ky. 441, 76 S. W. 185. The appellant relies largely upon the holding in that case. The appellee suggests that the case was between parties having but a slight interest in the main controversy; that it was prearranged, while the present case was in the lower court, to secure a location by the Court of Appeals of Kentucky, which would be controlling; and that that court did not have the advantage of a full presentation of their side by the present owners of the Ledford patent. The matter of the location of the patent was brought to the attention of the Court of Appeals in Asher v. Howard, 70 S. W. 277, 24 Ky. Law Rep. 961; Id., 72 S. W. 1105, 24 Ky. Law Rep. 2118, where the court refused a rehearing and declined to locate the patent because the necessary data were not then before it. The court evidently appreciated at that time the large interests involved, for it says so. The motion to advance and the briefs in the case of Creech v. Johnson further advised it of the importance of the main question. Under the circumstances, we must hold that whether the location of the Ledford patent, involved

in Creech v. Johnson, ought to have been heard and adjudicated, was one for the Court of Appeals to pass upon, and, since it entertained jurisdiction and delivered a considered opinion, which appears in the Reports of the court prepared for publication, we must accept its conclusions as its deliberate judgment upon the location of the patent, entitled to the weight such judgments usually are. Adams Express Co. v. Ohio State Auditor, 165 U. S. 194, 219, 17 Sup. Ct. 305, 41 L. Ed. 683.

We have been referred to a number of cases bearing upon the effect which should be given by a federal court to a decision of the court of a state upon a question of local law. Preston v. Bowmar, 6 Wheat. 580, 5 L. Ed. 336; Williamson v. Berry, 8 How. 495, 12 L. Ed. 1170; Suydam v. Williamson, 24 How. 427, 16 L. Ed. 742. But it has not become necessary for us to determine nicely the applicable rule, because, treating the location as an original matter, we have reached the same conclusion as the Court of Appeals of Kentucky did.

In conclusion: The present owners of the patent stand in the shoes of the patentees. The deed from the patentees, under which they hold, warned them of a possible mistake in the patent by expressly excepting "any part of the 86,000-acre tract which may be found to lay outside of the state of Kentucky." If they lose some land by this location, it was the patentee's fault, for which they must stand good. The patentees selected, and through the surveyor located, the land, and described it in the patent issued, which by the settled law of Kentucky is to be construed most strongly against the patentees. If they saw fit not to have the land actually surveyed, but a mere "call" survey by protraction made, they took the risk. As one of the witnesses, a surveyor of the early days, referring to such surveys, said:

"If you hit the land, you save it; and if you miss it, you lose it."

It closed and bounded a tract of land, but it was laid down in the wrong place. There was an overlap into Virginia and Tennessee. It cannot be presumed that Kentucky intended to grant land outside its boundaries, thus covered by its patent; nor can it be presumed that it intended to make good such a mistake by conveying land inside its boundaries not covered by its patent, as the patentees located it. All that Kentucky intended to grant was the land inside of Kentucky embraced within the boundaries of the patent, and such a grant is effected by locating the patent the way in which, concurring with the Court of Appeals of Kentucky, we have located it.

The judgment is reversed, and the case remanded for further proceedings in conformity with this opinion.