MINERAL DEVELOPMENT CO. et al. v. TUGGLE LAND & TIMBER CO.

(Circuit Court of Appeals, Sixth Circuit. March 18, 1907.)

No. 1,600.

BOUNDARIES—DESCRIPTION IN STATE PATENT—CONSTRUCTION.

A description of a tract of land in a state patent as "beginning on three chestnuts and chestnut oak near the head of the Pigeon Fork; thence (running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch; thence the dividing ridge between the Defeated Branch and Turkey creek), S. 10° W., 68 poles, to a chestnut, * * *" construed as though written, "beginning on three chestnuts and chestnut oak near the head of Pigeon Fork; thence (running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch, thence the dividing ridge between the Defeated Branch and Turkey creek), S. 10° W.,

68 poles, to a chestnut," etc., making such portion a single call, where, if construed literally as written, it not only left the courses and corners between the monuments called for undefined, but did not conform to the plat which accompanied the certificate of survey; whereas, as construed, the description and plat agreed, and the survey closed and embraced about the quantity of land called for.

Appeal from the Circuit Court of the United States for the Eastern District of Kentucky.

S. B. Dishman and D. D. Field, for appellant.

J. D. Black and J. W. Alcorn, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit in equity instituted by the Tuggle Land & Timber Company, claiming to be the owner of certain trees on two tracts of land in Letcher county, Ky.—one containing 404 acres, and the other 1749 acres—to enjoin the Mineral Development Company and A. B. Asher from denying, preventing, or in any wise interfering with its right to own, cut, and market the said trees. The plaintiff claimed title by intermediate conveyances from one Isom Stamper, under patent No. 10,899, issued to him by the commonwealth of Kentucky, February 5, 1848, for 12,000 acres of land. The plaintiff claimed that the two tracts of timber land described lay wholly within the boundaries of the Stamper patent of 12,000 acres; while the defendants contended that they did not lie within the said patent, but wholly outside the same, and based their claim of ownership to the timber on patents junior in date to the Stamper patent of 12,-000 acres. The whole controversy turns upon the true location of the Stamper patent of 12,000 acres. If the lines of this patent are located according to the contention of the plaintiff below, it is the owner of all the trees which it claims, and the defendants are without title to any of the five tracts or the timber thereon, which they claim under patents junior to that of Isom Stamper. On the other hand, if the defendants' contention as to the location of the Stamper patent is correct, the plaintiff below has no claim whatever to any of the trees on the five tracts claimed by the defendants under patents junior to that of Isom Stamper. The court below held in favor of the contention of the plaintiff, namely, that the Stamper patent of 12,000 acres embraced within its boundaries the 404-acre and the 1,749-acre tracts, on which the timber in dispute is located. From this the defendants below appealed.

The original certificate upon which the Isom Stamper patent was based, describes the land as surveyed July 24, 1846, for Isom Stamper, assignee of Elijah Combs, 12,000 acres of land by virtue of part of a Perry county court land warrant, No. 360, on Turkey creek, of the Line Fork of the North Fork of the Kentucky river, and bounded as follows, to wit:

"Beginning on three chestnuts and chestnut oak near the head of the Pigeon Fork; thence running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch; thence the dividing ridge between the Defeated Branch and Turkey creek; thence S. 10° W., 68 poles, to a chestnut;

thence S. 10° E., 98 poles, to a chestnut oak and sarvis, S. 68° W.; 125 poles, to a stake; thence S. 5° E., 100 poles, to a stake; thence S. 68° W., 2,000 poles, to a stake; thence S. 40° W., 320 poles, to a stake; thence north 1.328 poles to a stake; thence N. 77° E., 1,900 poles, to a stake; thence S. 33° E., 600 poles, to the beginning."

Accompanying this certificate was a plat in the following form:

The patent upon this plat and certificate was issued February 5, 1848, and describes the land as—

"Beginning on three chestnuts and chestnut oak near the head of the Pigeon Fork; thence running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch; thence the dividing ridge between the Defeated Branch and Turkey creek, S. 10° W., 68 poles, to a chestnut; thence S. 10° E., 98 poles, to a chestnut oak and sarvis; thence S. 68° W., 125 poles, to a stake; thence S. 5° E., 100 poles, to a stake; thence S. 68° W., 2,000 poles, to a stake; thence S. 40° W., 320 poles, to a stake; thence north 1.328 poles to a stake; thence N. 77° E., 1,900 poles, to a stake; thence S. 33° E., 600 poles, to the beginning."

It will be observed that the description of the 12,000 acre Stamper tract, as given in the certificate of survey, is the same in all respects as that given in the patent except that the word "thence" appears in the certificate between the words "Turkey creek" and the letters and figures "S. 10° W," but does not appear in the patent. The apparent object of this omission, for reasons which will appear more fully later, was to enable the language descriptive of the dividing ridges to be read parenthetically, thus:

"Beginning on three chestnuts and chestnut oak near the head of Pigeon Fork; thence (running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch; thence the dividing ridge between the Defeated Branch and Turkey creek), S. 10° W., 68 poles, to a chestnut; thence S. 10° E., 98 poles, to a chestnut oak and sarvis," etc.

A comparison of the description given in the certificate of survey, with the plat made from it and recorded, at once discloses the fact that there is apparently a discrepancy between the description and the plat; for while the description contains apparently eleven lines, the plat

as recorded, contains but nine, and these nine are the lines defined by courses and distances which are included in the description, and read as follows:

"Beginning on three chestnuts and chestnut oak near the head of Pigeon Fork; * * * thence S. 10° W., 68 poles, to a chestnut; thence S. 10° E., 98 poles, to a chestnut oak and sarvis; thence S. 68° W., 125 poles, to a stake; thence S. 5° E., 100 poles, to a stake; thence S. 68° W., 2,000 poles, to a stake; thence S. 40° W., 320 poles, to a stake; thence N. 1,328 poles to a stake; thence N. 77° E., 1,900 poles, to a stake; thence S. 33° E., 600 poles, to the beginning."

In other words, the apparent discrepancy is the result of the presence in the description of the following language immediately succeeding the designation of the beginning corner:

"Thence running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch; thence the dividing ridge between the Defeated Branch and Turkey creek."

And the real question in the case is whether this language should be interpreted as designating the opening lines of the survey, or as being merely descriptive of the ridges along which the opening lines as defined by course and distance, are to be run.

Coming to the consideration of this question, whether the survey is one of nine or eleven lines, it is to be noted, in the first place that, of the nine lines which make up the plat of the recorded survey, every one is defined by course and distance; that these courses and distances when run out, make a survey of the figure shown in the plat, which closes; and that it closes so as to embrace 13,500 acres, substantially the amount in the survey which calls for 12,000 acres; and it closes, no matter which way the lines are run, whether forward or backward, whether directly or by the reverse method. On the other hand, directing our attention to the language which is inserted immediately succeeding the designation of the beginning corner, namely "thence running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch; thence the dividing ridge between the Defeated Branch and Turkey creek," it will be observed that there is no course or distance given for these lines, or either of them, if they be regarded as two. After giving the beginning corner "at the head of Pigeon creek," the description says "thence running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch; thence the dividing ridge between the Defeated Branch and Turkey creek." If we regard this as a description of two lines, the first ends at "the Defeated Branch," or wherever that point may be upon this stream, while the second does not end at all, at least no termination is given. It is apparent that the location of these lines is uncertain, and must be left largely to guess work. It appears that Mr. Tuggle, the head of the plaintiff company, made a survey and a map which appears in the record, making use of the alleged calls along the ridges between Turkey creek and the Line Fork and Turkey creek and the Defeated Branch, with this result: That the first call from the beginning corner running the dividing ridge between Turkey creek and the Line Fork to the Defeated Branch, was 1,122.2 poles long, and the second call starting from the corner thus fixed

by Mr. Tuggle, and running the dividing ridge between the Defeated Branch and Turkey creek, was 1,144.52 poles long. This makes 2,-266.54 poles, or more than seven miles from the beginning corner of this survey to the first-marked corner thereof, designated by "a chestnut," which was followed 98 poles further on, by the corner designated by "a chestnut oak and sarvis." As a result of including these two lines running the ridges for nearly seven miles, which were not in the recorded plat, and were never used to ascertain the area embraced in the patent, it became necessary, in running the long line "S. 68° W., 2,000 poles," to shorten it to 1,120 poles, or 880 poles, over two miles and a half; and then to lengthen the long line on the west of the survey, which runs "North 1,328 poles" to 2,120 poles, an increase of 792 poles, or over two miles. As a result of this method of reconstruction, the Stamper patent of 12,000 acres was enlarged so as to include 16,000 acres.

Recurring to the description of the survey by courses and distances, being the lines used by the surveyor in making the plat, it is well known that the method in use in the early days in constructing a large survey in the mountainous region of Kentucky, "by protraction," known commonly as a "call" survey, was to mark the beginning corner by a monument, then survey and mark by monuments two or three short lines, and then complete the survey on paper by merely agreeing upon the courses and distances, filing the certificate, and subsequently making the plat. This was apparently the method pursued in the present case. The beginning corner was marked, and so were the succeeding lines designated by courses and distances and marked by monuments, the first of these being "S. 10° W., 68 poles, to a chestnut," and the next "S. 10° E., 98 poles, to a chestnut oak and sarvis." But, in the plan pursued by Tuggle, the lines marked by monuments which we have described, and which should have been at the beginning of the survey, and which there is everything to indicate were actually surveyed and marked, do not appear in the survey for nearly seven miles from the beginning corner, being separated by the two long lines running the dividing ridges which intervene. We cannot believe that this ever occurred; that the survey was ever so made. The inherent improbability is too strong, and, besides, the testimony of the witnesses, the Stampers, Cornett, Fields, and others, tends to show that the beginning lines and corners, marked by monuments, to which we have alluded, were actually run on the ground, beginning at the head of Pigeon Fork, and were marked on the ground as indicated in the description. The more we reflect upon the description in this survey, considered in the light of the facts in the record the more clear it becomes that the language descriptive of the dividing ridges, along which it was intended the opening lines of the survey should be run, was never designed to be treated as calls, or play any real part in the survey. This descriptive matter was merely ancillary, to be used if needed in laying out the opening lines. And, in this connection, it may be well to say that the opening calls of the survey, beginning at Pigeon Fork, and including the first three lines, did run the dividing ridge between Turkey creek and the Line Fork, and the dividing ridge between the Defeated Branch and Turkey creek, just

as indicated in the preliminary or parenthetical statement of the description. Really, it seems almost absurd to consider this descriptive matter respecting the dividing ridges seriously as calls of the survey. There was no place for them as calls or lines. The survey was complete without them. The nine lines shown in the p'at, reversed and run, beginning at Pigeon Fork, which was both the beginning and ending corner, close the survey, and leave no space for the interjected ridges, which were only mentioned as a guide to the location of the opening calls.

Conceding that there is doubt and ambiguity as to the location of this patent, the rule is well settled in Kentucky that such doubt, arising as it does from the certificate of survey, the plat and the patent, must be construed most strongly against the patentee, for whom the surveyor acted. Pearson v. Baker, 34 Ky. 321, 324; Bramblet v. Davis, 141 Fed. 776, 784, 72 C. C. A. 204. Evidently the surveyor who did the real work in making the map and locating the patent, understood perfectly what all the parties intended at the time. He knew why the descriptive matter respecting the dividing ridges was inserted, and limited it to the real object for which it was used. Elliott v. Gibson, 29 S. W. 620, 16 Ky. Law Rep. 708, 710.

The judgment is reversed, and the cause remanded for further proceedings in conformity with this opinion.