MINERAL DEVELOPMENT CO. v. KENTUCKY COAL LANDS CO.

(Circuit Court of Appeals, Sixth Circuit. October 10, 1918.)

No. 3104.

1. APPEAL AND ERROR ⨼231(5), 273(4)—RESERVATION OF GROUNDS IN LOWER COURT—ADMISSION OF EVIDENCE—OBJECTION AND EXCEPTIONS.

A general objection and exception to testimony as immaterial and irrelevant is not a sufficient basis for an assignment of error on the ground that it was incompetent as hearsay.

2. APPEAL AND ERROR ⨼837(6)—REVIEW—INSTRUCTIONS.

In reviewing an instruction the record must be considered as it was at the time of the charge to the jury, and it is immaterial to consider whether the court was right when it received evidence or right when it later struck it out.

3. BOUNDARIES ⨼37(1)—ACTION TO ESTABLISH—SUFFICIENCY OF EVIDENCE.

A verdict finding the boundary of a grant of land from the state of Kentucky as established by an old survey held reached under proper instructions and supported by the evidence.

In Error to the District Court of the United States for the Eastern District of Kentucky.

Action at law by the Kentucky Coal Lands Company against the Mineral Development Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Certiorari denied 250 U. S. ——, 39 Sup. Ct. 492, 63 L. Ed. ——.

W. B. Dixon, of Louisville, Ky., and E. L. Worthington, of Maysville, Ky., for plaintiff in error.

Ed. C. O'Rear, of Frankfort, Ky., for defendant in error.

Before KNAPPEN, MACK, and DENISON, Circuit Judges.

---

⨼For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

DENISON, Circuit Judge. A former phase of the question now involved was before us and is reported in Mineral Co. v. Tuggles Co., 151 Fed. 450, 81 C. C. A. 34. The present case was ejectment by the Kentucky Company against the Mineral Company. Upon the first trial of this case, a verdict was directed for defendant. The judgment entered on this verdict was reversed by this court (Kentucky Co. v. Mineral Co., 219 Fed. 45, 133 C. C. A. 151); and, upon the new trial, there was a submission to the jury and a verdict for the plaintiff. The defendant brings this writ of error. The parties will be named as they were arranged below.

Defendant traces an unbroken title to several surveys and Kentucky grants, the earliest of which were made in 1882. Plaintiff owns whatever title was conveyed by a 12,000-acre grant to Isom Stamper, made in 1848, and based upon a survey made in 1846. The whole dispute is as to the proper location of this Isom Stamper survey. If plaintiff's theory of location is correct, its title to the premises in dispute is clear. The general facts are fully stated in the opinion in 219 Fed. 45, 133 C. C. A. 151, to which reference should be made.

[1] 1. Aside from points directly involving the general merits of the case, the assignments of error present only a single question—one of evidence. It is that part of a certain deposition by Alexander Stamper should not have been received for the plaintiff. Before the first trial, the evidence of Alexander Stamper, as a witness for defendant, was taken by deposition, and the whole deposition was used by the defendant upon the trial. Before the new trial, the witness died, and the plaintiff, this time, read his deposition in evidence. Alexander Stamper was a son of Isom Stamper, who had died before this suit was commenced. A reference to the former opinion will show that the controlling question is whether the third, fourth, and fifth calls of the survey and grant run along certain ridges to Eagle Gap, or whether these lines entirely leave the ridges at a point five or six miles short of Eagle Gap. As bearing on this, it was important to locate the second and third corners. Alexander Stamper testified that his father, Isom Stamper, had, 50 years before, pointed out to him the location of these two corners. This testimony by Alexander Stamper was clearly hearsay, and it is argued that its admission was error because it did not pertain to a declaration against interest, and, therefore, was not within the exception to that general rule which forbids hearsay testimony.

We cannot consider the question thus argued. We say this, because the point was not saved by proper objection and exception. This class of testimony is excluded, not because it is irrelevant or immaterial, but because it is incompetent. Hearsay testimony is excluded because it is hearsay, and not for any other reason. It is therefore essential that, if it is to be rejected, it should be objected to for that reason. Diaz v. U. S., 223 U. S. 442, 450, 32 Sup. Ct. 250, 56 L. Ed. 500, Ann. Cas. 1913C, 1138. We find no such objection. The deposition was offered by plaintiff, and its counsel read introductory portions. When the question was asked where the corner stood that had been pointed out by the witness' father, the record says:

"Defendant objects, and objects generally to the introduction of this testimony by plaintiff, as it is not offering this deposition, and the court has made a different ruling in this case from the other. [After a delay:] The court here rules that plaintiff may read to the jury the direct testimony of Alexander Stamper, as given in his deposition offered yesterday. Defendant excepts to this ruling."

Thereafter, as to specific questions, the record shows:

"Defendant objects, but the court overrules the objection, and the defendant excepts."

Upon this point, as to these corners, no other objection or exception was made. We have frequently held that a mere general objection is no sufficient basis for an exception or an assignment of error, and that an objection which does not direct the court's attention to any good reason therefor does not support a claim of reversible error, even though, when the case reaches this court, a good reason has been thought of. Shea v. United States, 251 Fed. 433, 163 C. C. A. 451, decided August 3, 1918, and cases cited. There might be cases where the proper ground of objection, first specified on review, would be so obvious that the reviewing court would assume it to have been in the mind of the trial court; but not so here, where the objection was based upon two reasons which were specifically stated and each of which was obviously insufficient.

The assignment of error based on the admission of this part of the Alexander Stamper deposition must be overruled.

2. While it is insisted that the intent of the surveyor, in using the language selected by him, was not a proper thing to be considered by the jury at all, it is further claimed that, if there was to be any submission, it should have been accompanied by an explanatory charge making clear to the jury the rules of law affecting the conclusion it was to draw, and that it was error to omit such explanation. If there were merit in this complaint, it should not be considered, because no exception was taken to the charge in this particular, nor was the claim that there ought to be a fuller explanation brought to the attention of the trial judge.

[2] 3. The court charged the jury that it might find for plaintiff, if it found that the third, fourth, and fifth boundaries were actually marked upon the ground along the summit of the ridge to Eagle Gap as part of the survey; and it may be that the verdict rendered for the plaintiff rests upon the theory that such marking did occur. We designate this as the theory of actual location as distinguished from the theory of constructive location, later considered. The rightfulness of this charge is attacked because defendant says there was no evidence tending to support such a theory; and the existence or absence of such evidence is therefore determinative on this point. We conclude that the judge was bound to submit the issue to the jury as he did; and, in reaching this conclusion, we wholly exclude several more or less persuasive items of evidence which the trial court received but later struck out. The record must be considered as it was at the time of the charge to the jury, and it is therefore immaterial to consider whether the court was right when he received this evidence or right when he later excluded it.

[3] Viewing the record thus restricted, plaintiff starts with distinct and clear evidence tending to show that there was a marked line along the trees upon the summit of these ridges for the whole of the six or seven miles, as early as 1865; that several witnesses saw these marks before 1890; that at all these times, the marks appeared to be very old; that the marks on the beginning corner were of peculiar size and shape (made by a tomahawk) and the line of old marks on the top of the ridges had the same peculiar character; and that there was no other known survey which could have resulted in the marking of this line at so early a date as was indicated by the times when it was seen and its then apparent age. This testimony is to be interpreted in the light of all the circumstances hereafter mentioned tending to show that the line along the ridges was the one which the surveyor was trying to describe. If this were the entire record, it would hardly be disputed that there was enough to go to the jury to support plaintiff's theory; but defendant says that two other items of evidence destroy all its substantial basis.

The first item is that it appears that the surveying party came back from their work at the end of the day, and that there had not been time enough to run this line. This evidence, if it were wholly accepted as complete and accurate, would not be decisive. The marking of this line along the ridge did not require the services of a surveying party. The surveyor might have done it, or caused it to be done for him, at any time before he closed the transaction by signing and delivering his certificate, and there is nothing to show how much time might have intervened.

The other item is that plaintiff's surveyors, who went over the ground at a comparatively late date and who also testified to observing this old line, and that it appeared old enough to have been made before 1850, identified the trees which bore these old marks, and that, from certain ones of the trees so identified, blocks were later cut out and brought into court by defendant; and it was claimed to be thereby demonstrated, by counting the annual rings, that the marks on these trees, estimated by plaintiff's surveyors to be more than 60 years old, were, in fact, only about 30 years old, dating back from the trial in 1916. If it were to be conceded that the evidence of plaintiff's surveyors as to what they saw upon their comparatively recent trip was the strongest item of proof to support plaintiff's theory, and that this specific testimony had been wholly overthrown by the evidence of the blocks, still, this would not be decisive. There would remain the evidence of the several witnesses who say they actually saw such a marked line at a date earlier than these particular marks were made (if it is true that they were only 30 years old) and that it was then a very old line; and there would remain, also, the difficulty of attributing such an old line, if it existed before 1880, to any other survey than the one in question.

4. The conclusion that there was no error in submitting to the jury the question as to the actual marking of the line on the ground at the time of the survey does not dispose of the case, because the court submitted to the jury another theory upon which they might find

for the plaintiff, if they found against it on the former one. This second theory was one of constructive location, to the effect that even if the line was not marked on the ground, the certificate should be interpreted as carrying the boundaries along the ridges to Eagle Gap. However, the court charged that the jury could not accept this theory unless it found as a fact that the second and third corners were located on top of the ridge. The defendant's claim in this respect was that the second and third corners, as well as the first, were in fact located at points on one or the other side of the ridge, appreciably down from the summit, and hence it inferred that this was inconsistent with the idea of a line running along the summit and would not support the running of the third, fourth, and fifth boundaries meandered along the summit. The court adopted this inference, if the fact existed. Whether this was right or was a view too favorable to the defendant, we need not consider, because if the jury's verdict for the plaintiff is based on the theory of constructive location, it must have found, with plaintiff's claim, that the second and third corners were actually marked and located upon trees at the summit of the ridge.

It is now urged that the undisputed testimony requires a finding that these locations were not on the summit, and hence that it was the jury's duty, under the charge, not to find for plaintiff on the constructive location theory. We assume, without deciding, that the actual location of these corners a few rods away from the summit would be hopelessly inconsistent with the theory that the summit is the substantial boundary, and we come to the question whether the evidence permits only defendant's interpretation. It might be enough to say that the parties in the Tuggle Case, and the parties in this case went through two trials in the court below and two hearings in this court, all conceding that the second and third corners were in fact located on the summit of the ridge. Defendant's maps and surveys used upon the first trial were made upon that theory, and no doubt of its accuracy occurred to any one until new counsel, with knowledge derived from collateral litigation, came into the case. The substance of the matter, developed on the present trial, is that neither the locations accepted by defendant on the former trial as correct, or those now presented by it as accurate, can be reconciled with the certificate of survey, except by changing either courses or distances; that there are considerations tending to support the summit theory and others tending to support the side hill theory; but that it is quite impossible to pronounce the latter established as matter of law.

5. Error is alleged because the question of intent was submitted to the jury, and it is said that the construction of such a survey or grant is a question of law for the court. Upon further consideration, we remain satisfied with the conclusion reached upon the former hearing, viz. that whether the issue be called a mixed question of law and fact or whether it be said that the construction to be drawn as matter of law depended upon inferences to be drawn as matter of fact, there were issues for the jury—apart from the question of actual location of the third, fourth, and fifth boundaries for the whole distance. If the form of submission ought to have been other than it was (which

we do not intend to intimate), the defendant should have requested the adoption of the other form. In this connection, we should note the precise language of the court to the jury:

"The location of the boundary does not depend upon what was the actual or secret intention, if there was a secret intention of [the surveyor], as to where that line should be run; but the question is what [the surveyor] did at the time of the survey and in connection with the making of the survey to indicate where he intended that line should be. That is the ultimate fact that I am going to submit to the jury, when I come to give the court's charge to you on which the case will hang—the intention of [the surveyor] as to where that line is to be; and that intention is not his actual and secret intention, but it is his intention so far as it is disclosed by what he did at the time of making the survey and in connection with it."

However, if it were necessary to adopt as matter of law from this record the plaintiff's present theory of location or the defendant's present theory, we have no doubt that the former is the more probable and reasonable and should be chosen. The facts that Isom Stamper lived on lower Turkey creek, and that the tillable lands there were already granted to him or his neighbors; that there were ungranted tillable lands on the upper watershed of Turkey creek; that no lands, excepting immediately along the creeks, were, in that day, of any value; that it would have been the natural thing for Isom Stamper to wish to get title to the upper watershed of Turkey creek rather than to omit that and to reach out across a mountain range; that the survey and grant declare that the lands are "on Turkey creek,"[1] while defendant's theory puts the greater part on Leatherwood creek; that there was no apparent reason for leaving the described ridges until their end was reached; that the surveyor would, of course, intend to describe the territory which Stamper wished to take up; that courses 3, 4, and 5 correspond in a general way with the main bends of the described ridges; and that the distance given does not overrun the end of the ridges by any greater excess than such as is commonly overlooked in these mountain descriptions—all these things go far to produce conviction that when the surveyor said:

"Thence running the dividing ridge between Turkey creek and the Line fork to the Defeated branch; thence the dividing ridge between Defeated branch and Turkey creek"

—he meant to say, and the survey should be interpreted as saying, that his boundaries, as approximately described by course and distance, should follow the first ridge until the second was reached, and then follow the second until it was exhausted. If to these things we are permitted to add the further facts (proved or offered but later excluded) that both the surveyor and the patentee at the time of the survey declared in effect that they were running the ridges to Eagle Gap, that from 1846 until (at least) 1882 Stamper and all his neighbors supposed that the line was thus located, and made deeds as between

[1] The certificate says: "Surveyed * * * for Isom Stamper * * * 12,000 acres * * * lying on Turkey creek * * * bounded as follows." The patent grants "12,000 acres * * * lying and being * * * on Turkey creek * * * bounded as followeth." This highly persuasive fact has been ignored by defendant.

themselves calling for this line for the boundary, and that its location never was doubted until a surveying party, anxious to establish titles in the next county, "threw the line off the mountain," little doubt will remain that the jury in this case rightfully "put it back again."[2]

6. It is apparent, from the discussion in our former opinion, from an inspection of the map there found, and from what we have here said, that the strongest reason indicating, if not compelling, the adoption of plaintiff's theory of construction is found in the facts that the description plainly contemplated the running of the line along the second ridge, that between Turkey creek and Defeated branch, as well as along the first-named ridge, that between Turkey creek and Line fork, and that, under defendant's theory of construction, the line would leave the ridges altogether and go in another direction before it had reached the second ridge at all. Upon the present trial, defendant undertook to meet this argument by proof showing that from the summit of the ridge, at about the location of the third corner or end of the second boundary, Turkey creek lay upon one side, to the west; and the valley of Defeated branch could be seen by looking in another direction; and therefore it is said that the ridge between Turkey creek and Defeated branch had then been reached, no further following the ridge was required, and verdict should have been directed for defendant.

We think this theory wholly untenable. When we observe that the surveyor certainly had in mind two successive, "dividing" ridges, one of which began where the other ended, his language can refer only to the dividing watersheds, first between Turkey creek and Line fork, and then between Turkey creek and Defeated branch. This is a continuous watershed upon the western or Turkey creek side; upon the eastern side, it is distinctly divided by a spur of the ridge, indicated on the map (219 Fed. 51), which separates the waters of Defeated branch from those of Line fork. The junction of this spur with the main ridge plainly marks the dividing point between the two successively named portions of the main ridge; and, at the location of the third corner, this dividing point is not reached by about two miles. The fact that the Defeated branch valley can be seen from this corner is fortuitous, and is because the corner happens to be high and the way to be clear. Defeated branch is about twice as far away as the Line fork, and the line of vision passes over the Line fork watershed nearly all the way.

7. It is insisted that the decision of the Kentucky Court of Appeals in Carter v. Elk Coal Co., 173 Ky. 378, 191 S. W. 294, establishes the proposition that these lines must not be run along the ridges, but must follow the stated courses. With the fullest intention to apply any rules of construction which may be settled by the Kentucky courts, we are not persuaded that this decision has this effect.

In the first place, the argument rests upon a false premise. We are confronted with the statement in the opinion in the Tuggles Case and in the former opinion in this case that these ridges are not boundaries,

---

[2] Language attributed to defendant's surveyor (denied by him) as to what he had done and could do to the line in dispute.

but are aids or guides, and therefrom it is argued, in effect, that the reference to "along the ridge" must be wholly disregarded. There has been no holding to this effect. It has been held that the ridges are not boundaries in the sense that they constitute independent sides of the tract in addition to the stated course and distance lines. It has not been decided that they do not constitute an inherent part of the description of those boundaries which are approximately described by some of the course and distance lines. The thought that, in this way, they did, in effect, accurately mark the boundaries thus doubly described by course and by quasi-monument, was not involved in the Tuggles Case, but was distinctly approved in the former opinion in this case.

In the second place, we find nothing in the case stated indicating any intention to overrule the earlier Kentucky cases, referred to in our former opinion, and establishing the general principle that a line which is declared to run along a river or along a ridge, will, ordinarily, follow its meanderings instead of constituting a right line.[3] The case rather only illustrates the rule that each one of these grants must be construed according to its peculiar language, when interpreted by the topography of the country and by the monuments used. It was held that, where a line had been followed to and located at a known monument approximately where a spur joined a higher ridge, and which continued "thence down the spur" a certain course and distance to a monument which was well known and unquestionably located, the boundary should be a straight line from one monument to the other rather than one drawn along the irregular summit of the spur. The peculiar facts—as compared with those here—plainly justified, if they did not require, that conclusion. The distance was relatively short, one mile. The beginning and ending corners were actually located on the ground, instead of being left for location by force of description. The language "down the spur" was fairly, if not fully, satisfied by a line which ran from a point higher up on the spur to a point lower down thereon. It suggests only faintly, if at all, the thought which dominates the language now involved, and which in effect is "thence along the dividing ridge between two water courses until it joins the ridge between two other water courses, and thence along the latter ridge." The line approved did, in truth, run "down the spur," and its approval did not involve rejection of any descriptive words used, while the lines here, as defendant would locate them, do not run "along the dividing ridge." Carter v. Elk Coal Co. could only be made to support defendant's theory here by supposing that the description in that case

---

[3] To these, we may add Dupoyster v. Miller, 160 Ky. 780, 170 S. W. 182. A boundary was described as commencing at a stake in the B. & W. road, and continuing on three courses: "(1) Thence with said road N. 89° W. 38 poles to a stake; (2) thence N. 54° W. 57 poles to a stake; (3) thence S. 84° W. 90 poles to a stake in the road." The specified courses did not follow the road, but the road was held to be the boundary for the whole distance. The first course was with the road and the third course ended there. So Stamper's line began on the ridges and was again fixed there on the second ridge. There is close analogy. To the same effect is Bruce v. Taylor, 25 Ky. (2 J. J. Marsh.) 160. See, also, Brashears v. Joseph (Ky.) 108 S. W. 307, and the very interesting comments of Chief Justice Bibb in Whitaker v. Hall, 1 Bibb (Ky.) 72, 79.

had read "thence along the ridge to the spur, thence down the spur 350 poles to a stake," and that it had been held that the line should follow stated courses and abandon the ridge long before it reached the spur at all. Further, in this case, the jury has found that (at least) part of the five-course southeasterly boundary was actually located at the time on the ridge summit.

8. It is again urged upon us that the shape of the surveyor's plat forbids the adoption of plaintiff's theory of construction. We think not. The effect of plaintiff's theory is only to change the main southern boundary (the fifth) from a course south 68 degrees west to a course about south 50 degrees west,[4] and to shorten it from 2,000 poles to about 1,800 poles.[5] If, then, the opposite boundary, the eighth, is swung correspondingly to compensate for this 18 degree variation, as is frequently approved by the Kentucky courts (or even if it is not so swung), the resulting figure is not wholly dissimilar to that shown on the plat. Nor is the fact that the surveyor's plat uses straight and not broken lines very important in the interpretation of "along the ridge." Some of the Kentucky cases which have required a boundary to follow a winding course seem to have been construing a grant where the plat showed a straight course.

9. The defendant requested the court to charge that, if there was ambiguity or uncertainty in the survey, that construction must be adopted which, consistently with the evidence, was most favorable to the defendant, and assigns error because this was not given. No exception was taken, save one in general form, to the failure to give this request. The court did charge that the burden was upon the plaintiff, and that, unless the jury found that the fifth boundary was actually located on the ground along the ridge, or that what the surveyor did and wrote showed his intent to describe the line there located, the verdict must be for the defendant; that the plaintiff must establish one or the other of these alternatives by a preponderance of evidence; and that, if the evidence left the jury with no conviction or belief in favor of the plaintiff on one or the other of these alternatives, the verdict must be for the defendant. If the charge, as thus given, was not equivalent to the charge as requested, the variance is a matter of precision of language, and not of great substance. The case is one where the trial judge apparently intended substantially to comply with the request, and where fairness requires that counsel, if they think he has not done so, should specifically and at the time call his attention to the precise addition to the charge which is desired.

The judgment is affirmed.

[4] The only witness whose testimony we observe says 53 degrees.

[5] As meandered; considerably shorter, if straight.