INTERNATIONAL AGRICULTURAL CORPORATION v. STADLER.

(Circuit Court of Appeals, Sixth Circuit. April 7, 1914.)

No. 2438.

1. SALES (§ 119*)—CONTRACT—CONSTRUCTION.

Plaintiff, by means of a broker's sale note, purchased certain "crushed tankage" for fertilizing use, not to contain over 10 per cent. moisture, "analysis guaranteed 5.60 per cent. ammonia and 30.56 per cent. bone phosphate of lime or equivalent on destination," analysis, if any, by certain designated chemists, buyers' option, from samples drawn at time of shipment, cost at buyer's expense if guaranty was sustained, otherwise at seller's expense and pro rata deduction to be allowed. Held, that the contract contemplated that the exact proportions of the tankage might not always be the same; that the percentages might vary from the specified standard, in which case the buyer had no right to rescind, but should receive the tankage and claim a deduction.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 293; Dec. Dig. § 119.*]

2. SALES (§ 72*)—CONTRACT—CONSTRUCTION.

A contract evidenced by a broker's sale note, for a specified number of tons of crushed tankage to be shipped in dry merchantable condition, containing not over 10 per cent. moisture, "analysis guaranteed, 5.60 per cent. ammonia and 30.56 per cent. bone phosphate of lime, or equivalent," etc., "analysis, if any, buyers' option," by specified chemists, etc., was a

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

contract for the sale of "tankage," and could not be construed as a contract to purchase specified units of ammonia and bone phosphate.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 197–202; Dec. Dig. § 72.*]

3. SALES (§ 168*)—CONTRACT—CONSTRUCTION—ANALYSIS—OPTION—EXERCISE —REASONABLE TIME.

Where a contract, evidenced by a broker's sale note, for the sale of crushed tankage, provided that it should contain not more than 10 per cent. moisture, and that the analysis should be guaranteed 5.60 per cent. ammonia, and 30.56 per cent. bone phosphate of lime or its equivalent at $17.25 per ton of 2,000 pounds, f. o. b. cars at point of shipment, analysis, if any, by specified chemists, buyers' option, from samples drawn at the time of shipment, the contract did not apply the stated test and measurement before fixing the final purchase price; and hence the buyer's right to analyze must have been exercised within a reasonable time.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 403–408; Dec. Dig. § 168.*]

4. WORDS AND PHRASES—REASONABLE TIME.

What is a reasonable time is a question of law only when the ultimate facts are undisputed, and if the evidence or probative facts are such that reasonable men might draw different inferences therefrom, the question must be submitted to the jury.

5. SALES (§ 168*)—CONTRACT—CONSTRUCTION—PAYMENT OF PRICE.

Where a contract for the sale of crushed tankage in car load lots provided that it should contain not over 10 per cent. moisture, and that analysis should be guaranteed 5.60 per cent. ammonia, and 30.56 per cent. bone phosphate of lime, price $17.25 per ton of 2,000 pounds, f. o. b. cars at C., analysis, if any, by certain chemists, buyers' option, from samples drawn at time of shipment, the contract did not require analysis before payment of the price, evidenced by drafts with bill of lading attached.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 403–408; Dec. Dig. § 168.*]

6. SALES (§ 182*) — QUALITY — ANALYSIS OF SAMPLES — REASONABLE TIME — QUESTION FOR JURY.

A contract for the sale of crushed tankage at a specified price per ton, guaranteed not over 10 per cent. moisture, and 5.60 per cent. ammonia, 30.56 per cent. bone phosphate of lime, analysis, if any, by certain Baltimore chemists, buyers' option, from samples taken at the time of shipment. The last samples taken reached Baltimore October 19, 1910, and the analyses were made November 7th. The seller was then notified that the material was below grade. As to the remaining shipments, the greatest time elapsing between analysis and receipt of samples was 11 months, and the shortest, 40 days. *Held*, that whether the analysis was had within a reasonable time was for the jury.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 492–495; Dec. Dig. § 182.*]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; William R. Day, Judge.

Action by the International Agricultural Corporation against August W. Stadler. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

The plaintiff in error, whom we will call the plaintiff or the buyer, brought a suit at law, in the court below, against the defendant in error, hereafter called the defendant or the seller, to recover damages under the sale con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tract. Upon the statement of the case by plaintiff's counsel to the jury, the court directed a verdict for defendant. By the pleadings and the statement, these facts must be taken as appearing:

The plaintiff was engaged at Wilkesbarre, Pa., in manufacturing a fertilizer, and for this purpose it needed ammonia and bone phosphate of lime. The residuum of defendant's product, at Cleveland, Ohio, was called "crushed tankage," and contained the desired ammonia and phosphate. For one or more years the fertilizer company had purchased the defendant's entire output of this tankage, and on November 24, 1909, a broker's sale note was made whereby the fertilizer company purchased from the defendant his output for the ensuing year. The material parts of the note are as follows:

"Stock on hand and entire product to Dec. 1st, 1910, estimated fifty (50) to sixty (60) tons monthly, of seller's regular make crushed tankage, to be in dry merchantable condition, not over 10 per cent. moisture like goods shipped on contract of Nov. 5th, 1908, analysis guaranteed 5.60 per cent. ammonia and 30.56 per cent. bone phosphate of lime or equivalent on destination, price at seventeen dollars and twenty-five cents ($17.25) per ton of 2,000 lbs. f. o. b. cars at Cleveland.

"Shipment as ready in One (1) or Two (2) carload lots, seller's option, in bulk.

"Analysis, if any, by Wiley & Hoffman or Gascoyne & Co., Baltimore, buyers' option, from samples drawn at time of shipment, cost of same to be at buyer's expense if guaranty is sustained, otherwise at seller's expense and prorate deduction to be allowed.

"Settlement on seller's sworn certificate of f. o. b. weights.

"Terms: Sight draft vs. B. L. for full amount of each invoice. Draft to be drawn for presentation through Wyoming Valley Trust Co., Wilkesbarre, Pa."

Thereafter, at dates running from November 30, 1909, to October 11, 1910, the seller shipped 26 cars of tankage, each consigned to its own order at Wilkesbarre, and with each shipment drew a sight draft for the amount of the invoice upon the purchaser, attached this draft to the bill of lading, and sent the same to the Wilkesbarre bank for collection. The drafts were paid promptly, the bills of lading taken up, and the shipments received and used by the buyer. At the time of each shipment, the seller took from the car a sample in a two quart glass jar, and sent the sample by express to the brokers, at Baltimore, who had acted for both parties in making the contract. These samples were received by the Baltimore brokers sometimes at about the same day, often several days after, and in only two instances materially before, the day on which the corresponding draft was paid at Wilkesbarre.

In August, 1910, the buyer, for the first time, made any claim that the tankage was not up to the contract standard, the seller proposed to investigate, shipments ran along, and in November, 1910, the buyer, for the first time, requested the Baltimore chemists to analyze the samples which had accumulated in the brokers' possession. From the analyses, it appeared that every shipment was excessive in moisture and deficient in ammonia and phosphate. The buyer computed the pro rata deduction to which it was entitled under the contract to be various sums upon each car, aggregating about $6,700, and for the recovery of this amount this suit was brought.

The verdict seems to have been directed upon the ground that the purchaser, by paying the draft before getting its analysis, or by its general course of conduct, or by both, had waived its right to the pro rata deduction; and this is the ultimate question which, in one aspect or another, is presented by all the assignments of error.

J. M. Butler and Max Goldsmith, both of Columbus, Ohio (White & Case, of New York City, of counsel), for plaintiff in error.

Martin W. Sanders and Westenhaver, Boyd, Rudolph & Brooks, all of Cleveland, Ohio, for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1-3].
1. This contract was not the ordinary contract of warranty, a breach
of which in some jurisdictions does, and in other jurisdictions does
not, require prompt notice from the purchaser in order to preserve
his right of complaint. It is true the contract incidentally refers to
its "guaranty," but the contract was informally drawn by brokers, and
its true character cannot be determined by the casual use of a term;
indeed "guaranty" is not always synonymous with "warranty," nor is
it inapt in this situation. We think the contract plainly contemplates
that the exact proportions of the tankage may not always be the same,
that the percentages may vary from a specified standard, and that, in
such case, the purchaser has no right of rescission, but should receive
the tankage and claim the contract deduction. Of course, we do not
mean that the discrepancy might not be so extreme as to render the
material unsuitable for its intended use, and so justify rescission; but
that is not the condition foreseen and covered by the words chosen.
It is now the argument of the buyer's counsel that the contract should
be characterized as one for the purchase of units of ammonia and bone
phosphate. This is a proper characterization, with two exceptions:
First. Other material of value may have been contained in the tank-
age; as to that, the present record is not clear. Second. Instead of
being, on its face and primarily, a contract for the purchase of these
units, it was primarily a contract for the purchase of tons of tankage,
and only at the option of the buyer could it be transformed into one
for units of ammonia and phosphate. The material was to be shipped
as tankage, invoiced as tankage, and paid for as tankage. The analy-
sis which was to resolve the tankage into its units of value was not
certain to occur, but was contingent upon the exercise of the buyer's
option that there should be an analysis. Whether the words "buyer's
option" refer to the analysis or to the alternative chemists is imma-
terial because the phrase "analysis, if any," of itself sufficiently im-
ports that there should be one only if the buyer wished, for he was
the sole party who could possibly be benefited thereby. When we
thus construe the contract as one which did not automatically apply
the stated test and measurement before fixing a final purchase price,
but which rather adopted a quantity measurement as the price cri-
terion which should be followed until and unless one of the parties
demanded the alternative method, it necessarily follows that the con-
tract right to this option, which right carried no fixed time limit, must
be exercised within a reasonable time. The determinative question,
therefore, is whether the buyer, within a reasonable time, exercised
this contract option.

[4] 2. It is said that the question of reasonable time is, when the
facts are undisputed, a question of law, and language to that effect
is cited from Supreme Court opinions. Paine v. Central R. R. Co.,
118 U. S. 152, 160, 6 Sup. Ct. 1019, 30 L. Ed. 193; Earnshaw v.
U. S., 146 U. S. 60, 67, 13 Sup. Ct. 14, 36 L. Ed. 887. The state-
ment is entirely accurate, if by "facts" we mean ultimate facts; but
we think it inaccurate, if applied to evidential or probative facts from
which reasonable men may draw differing inferences; and the very

question as to how long a man may reasonably wait must often be one upon which minds may fairly differ. As applied to a situation of the general character here involved, there must be a minimum, delay within which the court can clearly say was, as matter of law, not unreasonable, and there must be a maximum, delay beyond which becomes unreasonable as matter of law; but between these limits, there is a field where the unreasonableness of the delay is either a question of fact or a mixed question of law and fact, so that its determination falls within the province of the jury. We take this statement of the rule to be a proper summary of the authorities (Long Bell Co. v. Stump [C. C. A. 8] 86 Fed. 574, 30 C. C. A. 260; Druse v. Wheeler, 26 Mich. 189, 200; note V, p. 341, 29 L. R. A. [N. S.]; note, p. 142, 4 L. R. A. [N. S.]); and for a discussion of the difference between ultimate facts and evidential facts see Kentucky Co. v. Hamilton (C. C. A. 6) 63 Fed. 93, 97, 11 C. C. A. 42.

[5] 3. Upon the record now presented, we can safely say that the contract did not require analysis before paying the draft. Such inference cannot be drawn from the face of the contract, nor from the construction which the parties, in their course of business, put upon the contract, according to the pleadings and the offered proofs. The normal inferences are that a sight draft is to be paid on presentation, and that a draft and bill of lading sent by mail would reach Wilkesbarre and be presented and paid at least as soon as samples would reach Baltimore, and before samples sent to Baltimore could be analyzed and the results returned to Wilkesbarre. The second recited inference might not be safe, if the purchaser's only protection had been by rejection, but the right to reclaim for the deficiency was expressly preserved, and this right may well apply to a subsequent reclamation rather than to a mere reduction from the payment to be made for the current shipment.

Further, the careful provision that the buyer should not get possession except by paying the full invoice price, contrasted with the affirmative promise of a compensatory allowance, is persuasively inconsistent with the idea that paying the draft waived any reclamation. We do not think the parties intended that a draft should go dishonored and a car accumulate demurrage for days or weeks while they negotiated about a claimed deficiency. If it should appear that, owing to the nature of the material or some custom of trade familiar to the parties, rights would be prejudiced by allowing the option for analysis to survive the payment of the draft, the subject-matter of this paragraph might require further consideration; but upon this record we see no such prejudice.

[6] 4. The last samples reached Baltimore October 19th, the corresponding drafts were paid October 31st, and the analyses were made November 7th. The delay was, therefore, 19 days, and the seller had been notified that the material was below grade. As to the remaining shipments, the greatest time elapsing between analysis and receipt of samples was 11 months; the shortest 40 days. Whether the delay in analysis of the last shipment (and indeed of all sent after the August complaint) was too great depends wholly, so far as this record in-

dicates, upon the probability of material change in the samples. As to the earlier shipments, there is the further question whether the delay and seeming approval were likely to affect the seller's conduct to his prejudice. We cannot say, as we are urged to do, that the latter result might not happen. If the seller had known after the first shipment or two that the tankage did not meet the standard, he could, we would naturally assume, have reduced the moisture and so have avoided the payment of freight on water, ultimately to be charged back to him. It may be that he could have changed his process so as to have produced more or lost less ammonia, and that, without disadvantage, he could have changed his raw material so as to have bettered his residual product. On the contrary, the previous years' dealings, or some other consideration, may furnish justification for failing earlier to subject the tankage to the agreed test. We do not determine the force of these things; we are only illustrating that there is or may be a field of doubtful fact affecting the ultimate question of what delay was more than reasonable.

5. In all that we have said, we have assumed that the contract, with the aid of that expert knowledge and that familiarity with the trade customs which should be attributed to the parties, furnishes a means of ascertaining the "pro rate reduction" which it promises. On its face, it does not do this. The excess of water could be presumed to be worthless, and so that allowance could be computed; the other constituents, beyond ammonia and phosphate, may or may not have had value enough to justify the freight. If no, they furnish no difficulty to the computation; if yes, then with reference to them, as certainly with reference to the phosphate and the ammonia, there must be expert aid in proportioning values. We have not hesitated to make this assumption, although not directly supported by the present record, because it seems improbable that the parties would have made a contract which was unintelligible to them.

6. Our conclusion that the contract itself required the exercise of its option by plaintiff within a reasonable time makes immaterial the question so much discussed by counsel whether the laws of Ohio or of Pennsylvania should control. There is no conflict. The meaning of the words "at destination" has not been argued or considered.

For the error in directing the verdict, the judgment must be reversed, with costs, and the case remanded for a new trial.