MURRAY et al. v. THIRD NAT. BANK OF ST. LOUIS.

(Circuit Court of Appeals, Sixth Circuit.   July 20, 1916.)

No. 2771.

1. **JOINT ADVENTURES** ⬤⟹5(2)—VERDICT—CONJECTURE.
   A verdict, depending on a finding that defendants made a joint purchase of stock, cannot be supported, where based on a conjecture.

   [Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. § 7;  Dec. Dig. ⬤⟹5(2).]

2. **BILLS AND NOTES** ⬤⟹394—INDORSERS—PERSONS PRIMARILY LIABLE.
   The Ohio Negotiable Instruments Act (Gen. Code Ohio, §§ 8175, 8185) declares that presentment for payment is not necessary to charge the person primarily liable on the instrument, although necessary to charge the drawer and indorsers, and that presentment for payment is not required to charge an indorser, when the instrument was made or accepted for his accommodation, and he has no reason to expect that it will be paid, if presented.   A bank, desiring to increase its capital stock, offered part of the issue to its shareholders at $150 per share, and the rest to the public at $275 per share.   The shareholders took their respective allotments of new stock, but of that offered to the public 200 shares were unsubscribed for, and to effect the stock issue the president subscribed therefor, giving a demand note, indorsed by the directors of the bank.   *Held*, that as, under the statute, a negotiable instrument is not deemed to have been made or accepted for the accommodation of the indorser unless he is primarily liable thereon, the note cannot be treated as one for the accommodation of the indorsers, on the theory that their indorsement benefited them by carrying out the stock issue which enabled them to acquire shares worth $275 for $150, for such excess in value was represented by the book value of the old shares, of which they already owned a proportionate part, and so such indorsers were entitled to demand presentment for payment.

   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 996–1050; Dec. Dig. ⬤⟹394.]

3. **BILLS AND NOTES** ⬤⟹243—INDORSERS—WHO ARE.
   Under the Ohio Negotiable Instruments Act (Gen. Code Ohio, § 8168), declaring that a person placing his acknowledgment on an instrument, otherwise than as maker, drawer, or acceptor, is deemed to be an indorser, unless he clearly indicates by appropriate words his intention to be bound in some other capacity, one who signs in form as an indorser cannot be held liable as a primary debtor, unless he has in appropriate language indicated an intention to be bound in some other capacity;  so the directors, who signed the president's note as indorsers, cannot be treated as primarily liable on the theory that the purchase was for the benefit of the entire directorate, that fact not appearing on the face of the note, nor shown by substantial testimony.

   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 549, 552, 553;  Dec. Dig. ⬤⟹243.]

4. **APPEAL AND ERROR** ⬤⟹1062(1)—REVIEW—HARMLESS ERROR.
   Where it is impossible to determine whether a verdict was based on a ground of liability improperly submitted, the submission of such ground of liability is prejudicial error.

   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4212; Dec. Dig. ⬤⟹1062(1).]

5. **BILLS AND NOTES** ⬤⟹537(7)—DEMAND NOTES—PRESENTMENT.
   Under the Ohio Negotiable Instruments Act (Gen. Code, Ohio, §§ 8176, 8297), declaring that, when an instrument is payable on demand, present-

ment must be made within a reasonable time after its issue, and what is a reasonable time depends on the nature of the instrument, or the usage of trade, the question whether a demand note is presented within a reasonable time is one of fact for the jury, or a mixed one of fact and law for their determination, unless the ultimate facts are undisputed, and are such that reasonable men cannot draw different conclusions.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1882–1884, 1887–1890; Dec. Dig. ☞537(7).]

6. BILLS AND NOTES ☞404(1)—DEMAND NOTE—INTEREST.

That a demand note bears interest does not make it any the less a demand note, but may be considered in determining whether the parties expected an immediate or early demand.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1091–1094, 1099, 1101–1103; Dec. Dig. ☞404(1).]

7. EVIDENCE ☞130—ADMISSIBILITY—DECLARATIONS.

Where the president of a bank subscribed to those shares of stock of a new issue unsubscribed for by the public, and the vice president induced directors to sign a note executed by the president to raise funds to pay his subscription, statements by the vice president to some directors, in the absence of the others, as to the purpose of the note, are not admissible against those not present.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 403; Dec. Dig. ☞130.]

8. BILLS AND NOTES ☞537(7)—ACTIONS—JURY QUESTION.

In an action on a demand note, the question whether it was presented within a reasonable time *held*, in view of the circumstances, properly submitted to the jury.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1882–1884, 1887–1890; Dec. Dig. ☞537(7).]

9. BILLS AND NOTES ☞510—ACTIONS—EVIDENCE.

In an action on a demand note, executed by the president of a bank and indorsed by the directors thereof, which was negotiated with plaintiff, a letter written by the vice president of the bank, who negotiated the instrument, stating its purpose, is admissible on the question of whether demand was made in a reasonable time.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1746–1759; Dec. Dig. ☞510.]

10. NOTICE ☞3—BANK DIRECTORS—BOOKS OF BANK.

Directors of a bank are not bound, as a matter of law, to know the contents of the books of the bank, including the accounts therein.

[Ed. Note.—For other cases, see Notice, Dec. Dig. ☞3.]

11. APPEAL AND ERROR ☞843(2)—DETERMINATION—MATTERS PRESENTED FOR REVIEW.

Where the evidence may differ on retrial, there being other errors necessitating reversal, the appellate court need not determine whether an instruction, correct in law, was justified by the facts.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3331; Dec. Dig. ☞843(2).]

12. WITNESSES ☞140(3)—COMPETENCY—DECEASED PERSONS—ADVERSE PARTIES.

In an action on a note, executed by one and indorsed by another, neither the maker nor other indorsers, who were made parties defendant, can be deemed adverse parties, within Gen. Code Ohio, § 11495, declaring that a party shall not testify when the adverse party is an executor, etc., as against the representatives of a deceased indorser; the maker not denying his primary liability, and the interests of the indorsers being presumptively the same.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 600; Dec. Dig. ☞140(3).]

13. WITNESSES ⊚⟶380(6)—EXAMINATION—IMPEACHMENT.

Gen. Code, Ohio, § 11497, permits the examination of an adverse party as if under cross-examination, and provides that the party calling for such examination shall not be concluded, but may rebut by counter testimony. In an action on a note, the ostensible maker, who made no defense, was called as a witness by plaintiff, and plaintiff was permitted, against objection, to show that the maker had made statements to its counsel contradictory to his evidence on trial and favorable to plaintiff. *Held* that, as a party calling a witness may, in case of surprise, question the witness as to inconsistent statements previously made by him, for the purpose of refreshing his recollection and inducing him to correct his testimony, but cannot discredit the testimony of his own witness, plaintiff was not entitled to prove the maker's contradictory statements, but could only rebut his testimony by showing the facts to be otherwise than as stated by him.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1215, 1219; Dec. Dig. ⊚⟶380(6).]

14. WITNESSES ⊚⟶380(5)—EXAMINATION—IMPEACHMENT.

One calling a witness cannot impeach him by proof of previous contradictory declarations, though he may call such declarations to the mind of the witness in case of surprise, for the purpose of inducing him to correct his testimony.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1214, 1219; Dec. Dig. ⊚⟶380(5).]

In Error to the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

Action by the Third National Bank of St. Louis against Samuel J. Murray and others. There was a judgment for plaintiff, and defendants bring error. Reversed and remanded.

A. C. Cassatt and Miller Outcalt, both of Cincinnati, Ohio, for plaintiffs in error.

Jos. S. Graydon and S. T. McPherson, both of Cincinnati, Ohio, for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge.

KNAPPEN, Circuit Judge. This is a suit brought by the Third National Bank of St. Louis against the maker and indorsers of a promissory note growing out of this situation:

Previous to February, 1909, the Second National Bank of Cincinnati was capitalized at $500,000; steps were taken to increase the capital stock to $1,000,000; $300,000 of the new stock was offered to existing stockholders at $150 per share, the remaining $200,000 to the public at $275 per share; all the stockholders took their respective allotments of new stock at 150. There remained unsubscribed of the stock offered the public $20,000 par value. Davis, the president of the Second National Bank, took this stock in his name. It was paid for in this way: Davis signed a demand note for $55,000 (the price of the stock), payable to himself, or order, with interest (rate not stated); the note was indorsed upon the back by Davis and by each of the directors. This note, accompanied by the stock as collateral, was negotiated at its face with the plaintiff bank by Galbreath, who was vice president and

one of the directors of the Second National Bank, and 'the proceeds turned into the capital stock account of the latter bank. Three per cent. quarter-yearly dividends were regularly paid upon the stock on the 1st days of May, August, November and February of each year, including February 1, 1912; the checks therefor being turned into an account carried on the books of the Second National Bank in the arbitrary name of "Williams, Guardian"—Williams being the bank's cashier. From this account quarter-yearly interest to December 31, 1911, at 5 per cent. per annum, was regularly paid to the plaintiff bank through the officials or employés of the Second National Bank. According to this practice the next installment of interest would be due March 31, 1912. The Comptroller of the Currency took charge of the Second National Bank on April 10, 1912, up to which time the directors had remained the same as when the note was indorsed, except that Kennedy had died August 23, 1910. The note was presented and payment demanded May 16, 1912. The pledged stock was afterwards sold, realizing less than $2,000 net. Suit was brought against all the parties to the note, Kennedy being represented by his executrix.

The amended complaint set up substantially the facts already stated, with the further allegation that all the defendants had agreed among themselves to purchase the stock and take title to it in Davis' name, with the intention of holding it until they could sell it at a profit, and that the note was to be paid out of the proceeds of the sale.

Davis and Galbreath made no defense. Brooks died after beginning of suit, which was dismissed as against his administrators as improperly revived. John F. Robinson compromised his liability under sections 8079–8084 of the General Code of Ohio. The remaining defendants other than Davis contended that they were mere indorsers for his accommodation and without consideration, that presentment for payment was not made within a reasonable time, and that they were thereby prejudiced in the fact that, had presentment been so made, the note would have been paid and the indorser saved harmless, either through Davis' personal responsibility or the sale of the stock. Motion by defendants for directed verdict, made at the close of the testimony, was overruled. The jury was instructed that, if the defendants other than Davis were indorsers for their own accommodation, no demand was necessary; otherwise, they would be liable or not according as demand of payment was or was not made within a reasonable time—both questions of fact being left to the jury. The verdict was for the amount of the note with accrued interest, less the amount realized on sale of the stock and less the amount paid by Robinson.

[1] 1. The jury was instructed that plaintiff had withdrawn its claim that defendants intended by the transaction in question to make for themselves a profit on the 200 shares of stock taken in Davis' name. Whether or not such action by plaintiff clearly appears, the question was properly withdrawn from the jury's consideration. There was no evidence to support the claim. Davis testified that the purchase was his individually; the indorsers Omwake, Albert, and Murray testified to the same effect. There was not only no direct testimony to the contrary, but no circumstances from which a contrary inference could properly be drawn. A finding of joint purchase could only rest

upon conjecture, which of course is an insufficient basis for a verdict. Smith v. Ill. Central R. R. Co. (C. C. A. 6) 200 Fed. 555, 556, 119 C. C. A. 33; Toledo, St. L. & W. R. Co. v. Howe (C. C. A. 6) 191 Fed. 776, 782, 112 C. C. A. 262.

[2] The Ohio Negotiable Instruments Act (G. C. § 8175) provides, however, that "presentment for payment is not necessary in order to charge the person primarily liable on the instrument," although, "except as herein otherwise provided, presentment for payment is necessary in order to charge the drawer and indorsers"; and by section 8185 "presentment for payment is not required in order to charge an indorser when the instrument was made or accepted for his accommodation, and he has no reason to expect that it will be paid if presented."

The concrete proposition in this regard, asserted by plaintiff, and submitted to the jury, is that the indorsing directors were interested in or benefited by Davis' purchase of the stock, in that the capital increase was thereby carried through and the indorsing directors thus enabled to obtain a large profit by "getting new stock at 150 which was selling in the market at about 275"; and plaintiff contends that the instrument was thus made for the accommodation of the indorsers within the meaning of the statute, and that the proceeds of the note thus really went to the indorsing directors as well as to Davis.

The generally accepted construction of provisions in negotiable instruments acts, similar to section 8185, is that they apply only to cases where the indorser is the primary debtor, the reason for the rule being that no one is bound to indemnify the primary debtor, and he is thus no more entitled to presentment, demand, or notice than if his true character had appeared on the paper. Bunker on Negotiable Instruments, p. 142. We think section 8185 must be construed as at least limited to cases where the indorser is a primary debtor; that is to say, one who intended to assume the capacity of either a sole or a joint maker.

[3] But by section 8168 a "person placing his signature upon an instrument otherwise than as maker, drawer or acceptor is deemed to be an indorser, unless he clearly indicates by appropriate words his intention to be bound in some other capacity." Similar provisions have been construed as requiring that the words indicating such intention appear on the instrument itself. Milling Co. v. Farmers' Co., 130 La. 950, 58 South. 825; Hopkins v. Commercial Bank, 64 Fla. 310, 60 South. 183; First National Bank v. Bickel, 143 Ky. 754, 137 S. W. 790; Id., 154 Ky. 11, 156 S. W. 856. See, also, Rockfield v. Bank, 77 Ohio St. 311, 327, 328, 83 N. E. 392, 14 L. R. A. (N. S.) 842. But there is authority to the contrary. Bank v. Busby, 120 Tenn. 652, 660, et seq., 113 S. W. 300. But were we to assume that the "appropriate words" indicating the intention to be bound otherwise than as indorser need not appear upon the instrument itself, we think it clear that under section 8168 one who signs in form as an indorser cannot be held liable as primary debtor, either sole or joint, unless he has "in appropriate language, used for that express purpose, indicated an intention to be bound in some other capacity," and that such intention is "not to be inferred from conduct or from language that is equivocal, much less from that which is con-

sistent with an intent to assume only the secondary liability of an indorser, and not the primary liability of a maker." McDonald v. Luckenbach (C. C. A. 3) 170 Fed. 434, 437, 95 C. C. A. 60.

Tested by that rule, we think there is a total absence of substantial testimony tending to show that the indorsing directors intended to assume the primary obligation of joint makers with Davis. As already said, there is no evidence that they were directly interested in the purchase of the stock in question. The proceeds of the note were not, in any proper sense, paid to them; and we find no substantial evidence that the maker and indorsers regarded themselves as ultimately jointly liable as between themselves. While the dividends did not quite take care of the interest, there is no evidence that the indorsers helped make it up. The only testimony having even a plausible tendency to show that the indorsers were primary makers is the statement in Galbreath's letter inclosing the note to the plaintiff bank, referring to the stock as "some stock we are holding and which we desire to place where it will bring business to us"; but this statement (assuming its competency as evidence) falls short of an assertion that the directors had the interest mentioned. It is at least as consistent with the idea that Davis was holding the stock, or even that it was being held by the bank.

Moreover, assuming, as we should, that the capital increase was regarded as for the bank's benefit and that of stockholders, the record fails to show that the directors were interested therein except to the extent and in the same way as were all the stockholders and the bank itself. The new stock allotted to the old stockholders was all taken at the same price of 150 and in proportionate allotments, and new stock could not intrinsically or by the bank's books be worth more than was paid for it, unless the old stock was worth more than that amount, and except as the value of the old stock was decreased by the apportionment of the original assets among the larger number of shares. To be specific, measuring by intrinsic or by book values of assets, and taking into account the amount paid in under the increase, the new stock could not be worth 275 unless the old stock was worth 350; and in the larger capitalization, whether affecting bank profits or stock market values, all interested in the bank profited in proportion to their stock holdings; and had the increase fallen through, whatever disadvantage resulted would have been ratably suffered by all. The situation bears thus a strong analogy to cases of indorsement of corporate paper by directors, who are usually held not to be primary makers or disentitled to presentment and demand by the mere fact of their interest in the corporation. McDonald v. Luckenbach, supra, at page 437 et seq.; Phipps v. Harding (C. C. A. 7) 70 Fed. 468, 478, 17 C. C. A. 203, 30 L. R. A. 513; Houser v. Fayssoux, 168 N. C. 1, 83 S. E. 804.

[4] Taking all these considerations into account, we think the learned trial judge erred in submitting to the jury the question whether the note was made for the accommodation of the indorsers; and as it is impossible to know whether the basis of the verdict was the lack of the indorsers' right to presentment and demand, or a demand in due season, the judgment must be reversed.

[5] 2. The question of presentment: Section 8176 of the General Code of Ohio provides that, "when the instrument * * * is payable on demand, presentment must be made within a reasonable time after its issue"; and section 8297 declares that "in determining what is a 'reasonable' time or an 'unreasonable time' regard is to be had to the nature of the instrument, the usage of trade or business (if any) with respect to such instruments, and the facts of the particular case."

Defendants contend that what is a reasonable time is a question of law for the court, that a delay such as was had here is plainly unreasonable as matter of law, and that it was thus error to submit to the jury the question of reasonable time.

In International Corporation v. Stadler, 212 Fed. 378, 381, 129 C. C. A. 54, 58, we held it to be properly deducible from the authorities that what is reasonable time is a question of law only when the ultimate facts are undisputed, and that if the evidence or probative facts are such that reasonable men might draw different inferences therefrom the question must be submitted to the jury; that between certain maximum and minimum limits "there is a field where the unreasonableness of the delay is either a question of fact or a mixed question of law and fact, so that its determination falls within the province of the jury." In Marmet Coal Co. v. People's Coal Co., 226 Fed. 646, 651, 141 C. C. A. 402, we expressly reaffirmed the rule as stated in the Stadler Case. While neither of these cases was under a Negotiable Instruments Act, yet we think the proposition there declared peculiarly applicable to section 8297, which makes the question of reasonable time depend upon the facts of the particular case. Bacon's Adm'r v. Bacon's Trustees, 94 Va. 686, 27 S. E. 576. The question has in several cases, under similar provisions of Negotiable Instruments Acts, been held to be one of fact. See German-Amer. Bank v. Mills, 99 App. Div. 312, 91 N. Y. Supp. 142; Becker v. Horowitz, 114 N. Y. Supp. 161; Hampton v. Miller, 78 Conn. 267, 61 Atl. 952; in which latter case demand was made more than six years after the date of the note.

[6-9] The question of reasonableness or unreasonableness of demand was properly made by the court to depend largely upon the intention of the parties as to whether the loan represented by the note and the pledged stock was intended to be a continuing investment, without any definite time being agreed upon, and, if so, the probable time within the intention of the parties that should elapse before demand should be made.

We think there was testimony tending to show, either directly or inferentially, that the parties intended the loan to continue more or less indefinitely upon periodical payment of interest. It was undisputed that the object of Davis' purchase and the directors' indorsement was to enable the carrying through of the stock increase; that the indorsers understood that the $55,000 was to be borrowed on the indorsed note, and with the stock collateral; that the loan was to draw interest, and that no time was fixed for its payment. While the mere fact that the note drew interest did not make it the less a demand note (Commercial Nat. Bank v. Zimmerman, 185 N. Y. 210, 77 N. E. 1020), yet, notwithstanding the holder had the right to demand immediate payment, the fact that the note was given for a loan rather than for a

debt in the current business tended to show that the parties did not expect immediate or early demand. Yates v. Goodwin, 96 Me. 90, 94, 95, 51 Atl. 804. We think there was testimony tending to show that the indorsers expected that Davis would carry the stock until he had opportunity to sell it where it would benefit the bank, in the way of bringing deposits or otherwise, and that the loan would meanwhile be carried. Each of the three indorsers who testified said that he signed at Galbreath's request and on his presentation of the note. The director who last indorsed testified that Galbreath told him he could arrange to get the money from the plaintiff bank, and that he thought he could sell the stock without any trouble, and with the proceeds would take up the note. Another said that Galbreath explained the situation to him when he indorsed and promised that the "whole thing would be cleaned up in a short while and be paid off." Galbreath did not testify, and appears to have been thought mentally incompetent to do so.[1] As Galbreath personally negotiated the loan and himself sent the note to the plaintiff, we think it fairly open to inference that the other directors were similarly requested by Galbreath to sign, although the statements made by him to individual directors, in the absence of the others, were not competent evidence as to such others unless in some way brought home to them.[2]

Again, continuing bank loans are often made on demand paper, with or without indorsement, and upon periodical payments of interest. This practice was recognized in Byles on Bills (Sharswood's Ed.) p. 338, the paragraph below being quoted with approval in 1 Daniel on Negotiable Instruments, § 610.[3] The periodical payments of interest tended to show an understanding that the loan was regarded as more or less continuing in character. See Hampton v. Miller, supra. The custom of carrying continuing bank loans on demand paper on periodical payment of interest was proven in Bacon's Adm'r v. Bacon's Trus-

---

[1] Robinson did not attend the trial, and his testimony was not taken. Kennedy had died. Plaintiffs in error are thus all accounted for.

[2] Defendants in their reply brief say (although in another connection): "Davis was willing to buy the 200 shares, so as to complete the stock increase and permit the bank to obtain its new capital. The indorsers, being the directors of the bank and having the interest of the bank at heart, were willing to assist Davis in this matter to the extent of enabling him, by their indorsement of his note, to borrow the necessary funds"; and elsewhere in the brief that "it is quite reasonable to assume that he [Davis] intended to sell it [the stock] when he had a good opportunity and where it would do the bank some good, in the way of bringing deposits or otherwise."

[3] "But a common promissory note payable on demand is very often originally intended as a continuing security, and afterward indorsed as such. Indeed, it is not uncommon for the payee, and afterward the indorsee, to receive from the maker interest periodically for many years on such a note. And sometimes the note is expressly made payable with interest, which clearly indicates the intention of the parties to be that, though the holder may demand payment immediately, yet he is not bound to do so. It is therefore conceived that a common promissory note payable on demand, especially if made payable with interest, is not necessarily to be presented the next day after it has been received in order to charge the indorser; and when the indorser defends himself on the ground of delay in presenting the note, it will be a question for the jury whether, under all the circumstances, the delay of presentment was or was not unreasonable."

tees, 94 Va. 686, 27 S. E. 576, Yates v. Goodwin, supra, and Bank v. Kennedy, 145 App. Div. 669, 130 N. Y. Supp. 412. True, there was in the instant case no evidence of such practice, but in view of the relations of the indorsers to the bank and to the loan, as well as their interest in Davis' disposition of the stock, we think their knowledge that the note was unpaid and their acquiescence in the carrying of it was open to reasonable inference. "A note presented according to the request or assent of the indorser is as to him presented in a reasonable time." Oley v. Miller, 74 Conn. 304, 308, 50 Atl. 744, 746.

It may be assumed that were there no facts and circumstances beyond the bare fact of delay in presenting an ordinary demand note, such delay as was had here would be unreasonable as matter of law; yet in view of the facts shown, and as the propriety of the inferences mentioned, and thus the ultimate facts, were not conceded, the question of reasonable demand was for the jury, even in the absence of proof of the custom referred to.

The refusal to direct verdict was thus not error, at least as against the indorsers other than Kennedy. While, as against him and his estate, the evidence of continued consent and acquiescence is not as forceful as against the other indorsers—by reason of his absence from home on account of illness for periods aggregating the greater portion of the time between the giving of the note and his death—yet in view of the evidence tending to show his original knowledge of the object of the stock purchase and the intended continuance of the loan, and his consent and acquiescence in its treatment and the delay up to the time of his death, together with an absence of proof that plaintiff knew of his death, we should be inclined to hold, if necessary to decide the question now, that the refusal to direct verdict in his favor was not error. But as the evidence on a new trial may differ materially from that presented by this record, we shall not now definitely decide that question. The criticism that the court left the question of reasonable demand to the jury without instructions as to the principles of law controlling does not impress us. True, the court might have gone into greater detail, but the issue and the substantial considerations affecting it were stated.

[9] 3. Galbreath's letter to plaintiff's president, inclosing the note and collateral, contained this statement:

"In accordance with my talk with you, I inclose note of S. H. Davis for $55,000 and indorsed by the different directors of the bank. This, as I explained to you, is some stock we are holding and which we desire to place where it will bring business to us. I do not think it will be long before it is taken up."

In view of the conclusion reached that the directors were merely indorsers, the question of the competency of this letter as showing a different situation is out of the case. Its application to the question of reasonable time alone is now important. We see no valid criticism of the charge respecting the inferences to be drawn from the letter, provided there was evidence tending to show that Galbreath was authorized to speak for the other indorsers. His statements in the letter are of course insufficient proof of such authority; and we assume that the mere fact that he was entrusted with the transmission of the note

would be insufficient proof of agency to bind the indorsers. That, however, is not the entire situation. For present purposes it may be assumed that Galbreath had before its making personally negotiated the placing of the note; that he had had charge of the procuring of all the indorsers and the forwarding of the note in accordance with his previous negotiations. He was himself one of the indorsers, and equally liable with the others. When the trial was had plaintiff's president, who conducted the negotiations, was dead. Galbreath was unable to testify. We think the letter was admissible as bearing, in connection with the interest payments, upon the reasonableness of plaintiff's delay, viewed from its standpoint, in presenting the note for payment. Upon that subject the question is not alone what the indorsers did know and intend, but includes what plaintiff was justified in concluding they knew and intended, and is not so much what Galbreath had the right to say as what plaintiff had the right to suppose was the extent of Galbreath's representation of the other indorsers. In this view, and for the purposes and to the extent stated, we think the letter competent evidence.

[10, 11] 4. The jury was correctly instructed (as requested by defendants) that the directors were not bound, as matter of law, to know the contents of the books of the bank, including the accounts therein. Worden v. United States, 204 Fed. 1, 122 C. C. A. 315. We find no exception to the further instruction permitting the jury to determine, from all the evidence, whether defendants knew the method in which the note transactions, including the payment of interest and dividends, were handled in the bank. Indeed, the instruction would be unexceptionable unless for lack of evidence to base it on. That question we need not consider, as the evidence may not be the same on a new trial.

[12] 5. Objection was made by Kennedy's executrix to the competency of the evidence of Davis and Albert, as in violation of section 11495 of the General Code of Ohio, which declares that "a party shall not testify when the adverse party is * * * an executor," etc. The statute was intended "to guard the assets of decedents against the setting up of fraudulent defenses, and the establishment against them of fraudulent claims, or unfounded causes of action." It seems to be grounded on the principle that, "when one of the parties to a contract cannot give his version of it, the other party thereto should not be permitted to testify in his own favor." Roberts v. Briscoe, 44 Ohio St. 596, 601, 602, 10 N. E. 61. The adversary nature of the parties does not necessarily depend upon whether they are arranged upon the same or opposite sides of the case. We think, however, that neither Davis nor Albert were adversary parties within the meaning of the statute. Davis' interests certainly did not conflict with those of the indorsers; his ultimate liability would be the same, whether or not the indorsers were held. As between themselves, the interests of the indorsers were presumably the same. Had Albert testified in his own behalf, the objection of incompetency would surely not have been good. It is difficult to see how the result is changed by the fact that he was called for the plaintiff.

[13, 14] 6. Plaintiff called Davis as a witness and was permitted, against objection, to show that he had made to plaintiff's counsel state-

ments contradictory of his evidence on the trial and favorable to plaintiff. This impeaching evidence was limited by the charge to its effect upon the credibility of the witness, with express instructions that it could not be regarded "as establishing the facts." The prominent basis of the criticism is that plaintiff should not be permitted to impeach the credibility of its own witness.

Plaintiff relies upon section 11497 of the Ohio Code, which permits the examination of an adverse party "as if under cross-examination," and provides that "the party calling for such examination shall not thereby be concluded, but may rebut by counter testimony."

The rule recognized by the Supreme Court of the United States (so far as seems applicable here) is that in the absence of statute, while a party calling a witness may be permitted, in case of surprise, to question the witness as to inconsistent statements previously made by him, for the purpose of refreshing his recollection and inducing him to correct his testimony, it was not permitted at common law to discredit the testimony of one's own witness by showing his contradictory statements. Hickory v. United States, 151 U. S. 303, 308, 309, 14 Sup. Ct. 334, 38 L. Ed. 170; Putnam v. United States, 162 U. S. 687, 691, et seq., 16 Sup. Ct. 923, 40 L. Ed. 1118. Such is the rule asserted by the Supreme Court of Ohio. Hurley v. State, 46 Ohio St. 320, 21 N. E. 645, 4 L. R. A. 161. The Ohio statute does not in terms give the right to discredit by proof of contradictory statements, but only to "rebut by counter testimony." This was permissible, even as to one's own witness, without the statute. Hurley v. State, supra; Hickory v. United States, supra; Putnam v. United States, supra. We are cited to no decision of the Ohio courts construing the statutory expression "may rebut by counter testimony"; and in the absence of such construction we are disposed to think that it gives the right only to rebut the testimony of the witness by showing the facts to be otherwise than stated by him, but not to discredit him by proof of his own contradictory statements.

We thus find it unnecessary to determine whether Davis was an adverse party within the meaning of the statute, or whether the statute is binding upon the federal courts.

The judgment of the District Court is reversed, with costs, and the record remanded to that court, with directions to award a new trial.